IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| CREATIVE MARKETING ASSOCIATES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 03-0211-CV-W-HFS |
| AT&T CORPORATION, | ) ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Before the court is defendant's motion for summary judgment on plaintiff's remaining claims alleging money owed, breach of fiduciary duty, and fraud.[1] The motion for summary judgment was argued on June 17, 2005. In addition to argument on limitations issues, defendant raised a parol evidence issue regarding plaintiff's claim for money owed. Due to insufficient briefing, the parties were granted leave to file supplemental briefings on this issue.

After review and due consideration of the written and oral argument presented by the parties, for the reasons set forth herein, defendant's motion for summary judgment will be granted[2].

---

[1] Plaintiff, Creative Marketing Associates, Inc. ("CMA"), commenced this action alleging damages for money owed, breach of fiduciary duty, fraud, and imposition of constructive trust. Defendant previously sought to have these claims dismissed. (doc. 10). By an order dated January 14, 2004, the motion was granted as to the claim for constructive trust, but the parties were directed to file additional briefing and documentation regarding the remaining claims. (doc. 26).

[2] Consequently, defendant's motion to strike plaintiff's expert, Thomas Fish, (doc. 106), is denied as moot.

Background Facts

Some fourteen years ago plaintiff developed a spelling contest for entertainment purposes, and through marketing and advertising, the public was invited to call a 900 phone number to play the SPELLIT game, and have a chance to win monetary rewards. On November 5, 1991, plaintiff entered into a Billing Services Agreement ("the Agreement")[3] with defendant whereby the latter agreed to route calls from originating phone numbers over its network to plaintiff. Once callers placed a call to 1-900-SPELLIT, defendant would route the calls to plaintiff. Defendant would then bill the caller directly or through the local exchange carrier for the call.[4] The Agreement was followed by a salesman's letter dated November 8, 1991 (Exh. C) dealing with the issue of "uncollectables", which has become central to this controversy.

According to plaintiff, "defendant represented that uncollectibles" or "chargebacks" were not expected to exceed 2-3% of plaintiff's SPELLIT sales.[5] Plaintiff converts this into an alleged guaranteed maximum of 2.5%. Under the Agreement defendant promised to pay plaintiff for all calls on a monthly basis, less a 30 cents per minute transport fee, a 10% billing and collection fee, and chargebacks as previously described.

---

[3] Attached as exhibit B to defendant's Suggestions in Support of Summary Judgment.

[4] Plaintiff describes this arrangement as AT&T MultiQuest service, whereby an information provider ("IP"), such as itself, would, with the assistance of AT & T, provide information based skill contests for callers' entertainment.

[5] Pursuant to the Agreement, defendant would undertake good faith efforts to collect charges from the callers; however, it could remove from a caller's bill any amounts associated with SPELLIT that the caller disputed. The Agreement further stated that plaintiff would remain obligated to defendant for any amounts removed from a caller's bill.

2

Plaintiff claims that on call volume resulting in revenue in the amount of $6,026,198.52, defendant charged it $602,619.85 for billing and collecting services. (Petition: pg.6; par. 9). Plaintiff argues that at the agreed upon rate of 2.5%, only $150,655 would be due to defendant in chargebacks. (Petition: pg. 9; par.17). Plaintiff alleges, however, that defendant has withheld and refused to pay it $1,326,854.64 as chargebacks against the $6,026,198.54 in generated revenue, which reflects an overcharge of $1,176,199.64, recoverable at the legal rate of 9% since February 1, 1993, for a total sum of $2,793,179.87.[6] Plaintiff therefore seeks this sum as money owed based on the agreement pursuant to R.S.Mo. 516.110; and, pursuant to R.S.Mo. 516.120(5), claims $13,000,000 as punitive damages on its claims of breach of fiduciary duty and fraud.

## Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. Anderson, at 252.

---

[6]This claim is an update and slight revision of a claim asserted by letter dated December 30, 1994. Exh. A to Declaration dated April 25, 2005 (Doc. 96).

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. Anderson, at 250. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, at 322-23.

## Money Owed

Defendant contends that, based on various statutes of limitations, plaintiff's claims are time barred. As noted above, the order dated January 14, 2004, determined that plaintiff's claim for money owed dealt with a contract to pay money, in the broad sense adopted by the Missouri Supreme Court in Hughes Development Co. v. Omega Realty Co., 951 S.W.2d 615 (Mo. banc 1997). As such, the ten year contract statute of limitations, R.S.Mo. 516.110, applied to the claim based on a contractual limitation of the amount that can be classified as uncollectible. Before dealing with defendant's additional contention that there is no such contractual guarantee I deal with questions of timing that assume arguendo, that plaintiff has a submissible theory of a contractual cap on chargebacks.

Defendant argues that plaintiff became aware of the alleged money owed in the spring of 1992; thus, it was at that time that its damages were capable of ascertainment. However, since plaintiff did not commence this action until January 23, 2003, the claim for money owed is time barred. Plaintiff counters that the period of limitations did not begin to accrue on the date it learned

4

of the chargeback discrepancy but, rather, on the date that the final installment was due. According to plaintiff, the agreement provided that defendant was to pay plaintiff for calls made to SPELLIT in a given month within 60 days from the close of the month. Since the SPELLIT phone lines remained open until December 28, 1992, therefore, defendant's final payment was due on or before March 1, 1993. Thus, its action was timely filed on January 23, 2003, within ten years after the last transaction giving rise to the complaint.

In support of its argument, plaintiff relies on R.S.Mo. 516.100, which provides that the cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is sustained and capable of ascertainment, and, if more than one item of damage, then the last item, so that all resulting damage may be recovered, and full and complete relief obtained. Sabine v. Leonard, 322 S.W.2d 831, 837 (Mo. banc 1959).

In its reply brief, defendant attempts to distinguish Sabine on the ground that it involved money owed on a promissory note. Defendant cites cases which have purportedly rejected Sabine where the contract is indefinite as to a close-out date. Willits v. Peabody Coal Co., 188 F.3d 510 (Table), 1999 WL 701916 at *14-19 (6th Cir. Sept. 1, 1999); see also, Nettles v. AT&T, 55 F.3d 1358, 1363-64 (8th Cir. 1995); Vogel v. A.G. Edwards & Sons, Inc., 801 S.W.2d 746 (Mo.App. 1990); Davis v. Laclede, 603 S.W.2d 554, 555 (Mo. 1980).

Except for Willits, the cases relied on by defendant arise under sections of the statute governing claims other than for money owed pursuant to R.S.Mo. 516.110, and are not helpful to the defense. For example, in Nettles, the plaintiff alleged claims for breach of contract and fraud under R.S.Mo. 516.120, and argued that although some damage was ascertainable when she

5

discovered that defendant breached its promise of employment, the resulting severe emotional distress and depression was not discovered until diagnosed in 1993. Nettles, 55 F.3d at 1363. However, the court declined to give to the term "item of damage" the broad interpretation argued by the plaintiff. Id. Similarly, in Vogel, plaintiff alleged a claim for breach of fiduciary duty under § 516.120. Vogel, 801 S.W.2d at 746-47. The court determined that, for statute of limitation purposes, a claim based upon churning did not accrue when the last item of damage was sustained, but that plaintiff was entitled to damages under the "continuing or repeated wrong rule."

Somewhat in contrast with Vogel, Judge Collinson found that Missouri law, consistent with Sabine, allowed use of the "last item" of the claim to preserve it from the statute of limitations in another broker case, Smith v. Smith Barney, Harris, Upham & Co., 505 F.Supp. 1380, 1391 (W.D.Mo. 1981). Reed v. Rope, 817 S.W.2d 503 (Mo. App. 1991), preserved for decades a claim for violation of an antenuptial agreement, on the continuing theory of Sabine, when the "last item" of damage occurred within the statutory period.

The Willits opinion, if followed, squarely supports defendant, in that it would limit Sabine to cases of installment contracts and other relationships with a scheduled close-out. I must give considerable deference to an opinion of a Federal Circuit Judge, with a result accepted by a panel, even though it has not been reprinted in the Federal Reporter. Willits contains an extensive analysis of Missouri law.[7] I do conclude, however, that the district judge made a better estimate of Missouri law, based on cases like Reed and Smith. The Willits effort to cabin Sabine may be sound, as a matter of public policy, but in my judgment would require legislation. I, therefore, follow Sabine

---

[7]My supposition (somewhat speculative) is that the panel chose not to publish a detailed and significant ruling as to Missouri law because it did not want to assume responsibility for somewhat intricate analysis of the law of a distant state.

6

and conclude that the "last item" of the claim post-dates the early 1993 date that would bar proceeding with the money owed portion of plaintiff's lawsuit. Therefore, plaintiff's claim for money owed is timely.[8]

Defendant, however, argues that the claim fails as barred by the parol evidence rule. Plaintiff's claim for money owed rests in large measure on two alleged promises: (1) an oral representation, which pre-dated execution of the agreement, made by Tony Dandridge who allegedly assured plaintiff that chargebacks would not exceed 2 to 3% of the call volume; and (2) a letter from Dandridge dated November 8, 1991, in which this alleged promise is supposedly repeated. It is also undisputed, however, that the agreement executed by the parties contained no such provision, and purportedly superseded "all prior agreements, proposals, or understandings, whether written or oral." Further, the agreement would be "construed in accordance with and governed by the local laws of the state of New Jersey."[9] (Agreement: ¶¶ 17(F)(G)).

In response, plaintiff argues that the agreement was not a completely integrated final agreement, thus, both the supposed oral promise of Dandridge, as well as his letter dated November 8, 1991, are admissible to show the intent of the parties; which, according to plaintiff, was that

---

[8]The timing is very close, however, in that the last telephone calls were more than ten years before suit was filed, but the claim is saved from untimeliness by the contractual provision for payment to plaintiff by defendant for some sixty days thereafter, assuming the validity of the claim for timeliness analysis.

[9]In opposition, plaintiff belatedly argues that the choice of law provision is invalid and Missouri law controls. Plaintiff's argument is unpersuasive. Where federal jurisdiction is based on diversity of citizenship, the law of the forum state is applied when deciding choice of law issue. PVI, Inc. v. Ratiopharm GMBH, 253 F.3d 320, 326 (8th Cir. 2001); see also, Davidson & Associates v. Internet Gateway, 334 F.Supp.2d 1164, 1175 (E.D.Mo. 2004). Missouri courts generally recognize that parties may choose the state whose law will govern the interpretation of their contractual rights and duties. Davidson, at 1175. Moreover, the agreement at issue is not contrary to a fundamental policy of Missouri.

7

chargebacks would not exceed 2 to 3% of the call volume. Plaintiff also claims that the absence of finality is demonstrated by a provision in the agreement permitting modification, (Agreement: ¶ 18(A)); and under Missouri law, the parol evidence rule would permit extrinsic evidence of a prior agreement. Plaintiff also seeks to escape the parol evidence rule by asserting fraud.

Plaintiff's efforts to expand the written agreement are unsound. The Dandridge letter fails most obviously because it simply represents what the average scale of "uncollectables" has been. Moreover, the letter is unsigned by plaintiff and it is not shown that salesman Dandridge had contractual authority, even though he may have been a Regional Sales Manager. He did not, for instance, exercise a prerogative to sign the agreement on which plaintiff sues. If the Dandridge letter gave needed assurances to a banker, as a practical matter, as plaintiff claims, that lends nothing to the contention that it creates a promise supplementary to the contract. It plainly does not.

Insofar as plaintiff may be able to show that there was a negligent or deceitful misrepresentation of defendant's past experience, that might support a fraud claim, governed by a different statute of limitations. Of course plaintiff is correct that fraud may be asserted despite the parol evidence rule, but a claim of fraud does not transform itself into a contract claim, which is the basis asserted for use of the ten-year statute of limitations.

Assuming plaintiff would have a disputed claim that Dandridge went beyond the written contract and promised that plaintiff's uncollectible experience would not exceed 2% or 3%, such a contention would be barred by the parol evidence rule. The Billing Service Agreement itself notes that it is "the entire agreement between the parties" and contains plain warnings against reliance on "prior agreements, proposal or understandings, whether written or oral." (¶18.F to Exh. B, attached to the Suggestions in Support of Summary Judgment). A major citation of plaintiff's, relating to

8

New Jersey law, states the generally controlling rule that where a "writing contains a statement to the effect that it is the complete and final statement of the agreement, the courts may give the statement conclusive effect in determining integration." United States v. Clementon Sewerage Authority, 365 F. 2d 609, 614 n. 1 (3d Cir. 1966). The parties have cited other cases to the same effect. No magic language was needed, as plaintiff seems to assert.

Since plaintiff has tendered no subsequent agreement that supports its claim, the fact that the Agreement was amendable is immaterial. Neither is it material that plaintiff seeks to manufacture issues of ambiguity which do not deal with the question at hand. As noted before, the parade of complaints that plaintiff seeks to incorporate in its supplemental briefing is simply a distraction, where they have no bearing on the ten-year statute and, as will be seen, are otherwise fatally stale.

Plaintiff also fails to convince me that Missouri substantive law applies, or is contrary to the result here reached. The "Money Owed" claim, based on a contract theory that Dandridge was one of the ultimate contracting agents, would not be submissible to a jury, although it was timely filed, and the motion for summary judgment will be granted as to that claim.

Breach of Fiduciary Duty

Breach of fiduciary duty is governed by a five-year statute of limitations under Missouri law, pursuant to R.S.Mo. 516.120(4). Johnson v. Berry, 228 F.Supp.2d 1071, 1077 (E.D.Mo. 2002); citing, Klemme v. Best, 941 S.W.2d 493, 497 (Mo. banc 1997). Section 516.120(4)'s limitation begins to run when damage is sustained and objectively capable of ascertainment. Klemme v. Best, 941 S.W. at 497. Damage is ascertainable when the fact of the damage can be discovered or made known, not when the plaintiff actually discovers injury or wrongful conduct. Id. Indeed, all possible

9

damages do not have to be known, or even knowable, before the claim ripens and the time begins to run. Id.

Plaintiff contends that because a fiduciary relationship existed, and defendant breached its duty, its claims did not accrue until it "actually" discovered the fraud. According to Maynard Small, plaintiff's president, this did not occur until 2005, during the depositions of several of defendant's employees. (Small Affidavit: ¶ 26). This begs the question, however, as to why, on the one hand, plaintiff would file suit against defendant on January 23, 2003, alleging, *inter alia*, fraud, while on the other hand, claim that it did not actually discover the purported fraud until 2005[10].

A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relationship. Kurth v. Van Horn, 380 N.W.2d 693, 695 (Sup. Ct. Iowa 1986). Some relationships which give rise to a fiduciary relationship include those between an attorney and client, guardian and ward, principal and agent, executor and heir, trustee and *cestui que trust*. Kurth v. Van Horn, 380 N.W.2d at, 696.

Plaintiff claims a fiduciary relationship with defendant, and argues that defendant held itself out as its agent in the agreement, and that defendant was placed in a position of trust and dominance over plaintiff because it controlled the phone service, and handled billing and collection to the exclusion of all others. (Petition: pg. 2-3; par. 4-5). The initial relationship between plaintiff and defendant was, however, an arm's length transaction made between two companies engaged in business enterprises. Although plaintiff claims to have been subsequently helpless, and, therefore,

---

[10]I am satisfied that what is learned during pretrial discovery cannot be used to delay the running of the statute of limitations. Any other ruling would always allow evasion of the statute. What is learned after suit is filed must necessarily be disregarded in applying a discovery trigger for the statute.

10

trustful of defendant, plaintiff fails to adequately support such an allegation. The knowledge of an alleged breach of contract as early as 1992 is inconsistent with subsequent credulity. See also the Maynard Small letter of December 30, 1994, previously noted.

Plaintiff's most plausible contention that defendant was a fiduciary relates to the period <u>after</u> the contract was entered into, and while defendant was collecting accounts. It is difficult to put together a breach of fiduciary duty claim from the activities that ensued, even considering pretrial discovery. Instead, they arguably reflect "mismanagement by AT&T indicative of poor ability to bill and collect accounts efficiently", to use Mr. Small's language in 1994. This would be a claim in negligence, subject to a five year statute. For example, even though a lawyer may be a fiduciary in some sense, a claim for professional negligence is governed by a special statute, and is not extended because a fiduciary relationship may exist. Moreover, when the chargebacks greatly exceeded the amount that plaintiff expected, and that it claims were promised, there was clearly a "lack of reasonable diligence" on its part in failing to promptly pursue a potential fiduciary claim. <u>Rademeyer v. Farris</u>, 284 F.3d 833, 838-39 (8th Cir. 2002).

Thus, even assuming a fiduciary relationship during the course of execution of the Agreement, I am satisfied that the limitations period began to run in the spring of 1992, when any damages were capable of ascertainment, and plaintiff's claim had to be filed on or before the spring of 1997, to be timely. Defendant will be granted summary judgment on the fiduciary duty claim.

### Fraud

Defendant argues that plaintiff's fraud claim is also untimely under the five-year statute of limitations governed by R.S.Mo. 516.120(5). An action for relief on the ground of fraud is governed

11

by § 516.120(5). Klemme v. Best, at 497. Under this subsection, a claim of fraud has a five-year limit, but it begins to run only upon "the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud." Johnson v. Berry, 228 F.Supp.2d 1071, 1077 (E.D.Mo. 2002); quoting, Klemme v. Best, at 497.

Plaintiff argues that if the fraud is not discovered within the ten year period following the facts that constitute the fraud, the five-year statute of limitations does not begin to run until the expiration of the ten-year period. Community Title Co. v. U.S. Title Guar. Co., Inc., 965 S.W.2d 245 (Mo.App. E.D. 1998). Plaintiff contends that even if October 1991, the date SPELLIT commenced, is used as the accrual date, then it would be held to have discovered the fraud on or before October of 2001, the ten year period following the facts giving rise to the alleged fraud. Plaintiff next claims that since it did not discover the fraud during that time period, but, rather, not until 2005, it is entitled to an additional five year period, or until November of 2006, in which to commence a timely action.

Although plaintiff's initial argument has merit, as previously noted, its claimed date of discovery, i.e. 2005, is entirely unsound. In support of its claim for fraud, plaintiff contends that it was induced to enter into an agreement with defendant by false misrepresentations made by defendant's representative, Tony Dandridge, regarding the amount of chargebacks. In support of these allegations, plaintiff asserts that it was told about the maximum expected chargebacks both prior to and after entering into the agreement; plaintiff also points to the Dandridge letter. It also

12

contends, rather elusively, that defendant was guilty of fraud (not just negligence) as plaintiff's agent.[11]

Defendant counters that although the agreement states that plaintiff will be charged with uncollected charges, it is silent as to the scope of expected chargebacks. Defendant also argues that even if, *assuming arguendo*, Dandridge orally promised plaintiff that chargebacks would not exceed 2 to 3%, the integration clause contained in the agreement expressly states that it "supersedes all prior agreements, proposals or understandings, whether written or oral." If there was fraud, however, defendant cannot hide behind the parol evidence rule in defending a tort claim (as distinguished from a contract claim for money owed).

Plaintiff argues, moreover, that due to defendant's fraudulent concealment of material facts, the statute of limitations is tolled, pursuant to R.S.Mo. § 516.280. Rademeyer v. Farris, 284 F.3d 833, 838 (8th Cir. 2002). The Circuit opinion also determined that, notwithstanding the breach, plaintiff should have known that he suffered damages; thus, any attempt at fraudulent concealment was irrelevant for tolling purposes. Rademeyer, at 838.

Although plaintiff claims that it had no knowledge of any alleged fraudulent conduct on the part of defendant, the evidence presented contradicts this claim. In his affidavit, Small averred that during the period of November, 1991, through January of 1992, SPELLIT had uncollectible rates of less than 1%. (Small Affidavit: ¶ 24). Yet, Small further avers that in the spring of 1992, defendant "slammed" it with hundreds of thousands of dollars in "chargebacks" completely by

---

[11]These shifting theories are inconsistent with the measure of damages pleaded, which rests entirely on the alleged representation regarding charge-backs. They may well be disregarded under the pleading requirement of specificity in alleging fraud. Rule 9 (b) FR Civ Proc. Plaintiff has not sought to amend its pleading to specify detailed new theories of fraud.

13

Case 4:03-cv-00211-HFS   Document 121   Filed 09/15/05   Page 13 of 16

surprise. (Id: ¶ 25). [12] Small also admits that by October of 1992, SPELLIT was running a quarterly contest and receiving calls, yet it received no revenue payments from defendant. (Id.: ¶ 27). It would appear that a "surprise" such as this, depriving plaintiff of hundreds of thousands of dollars, would sufficiently put one on notice as to possible misconduct by defendant as well as potential damages.[13] In any event plaintiff learned long ago that any promise concerning a minuscule uncollectible chargeback figure was illusory and would have had reason to believe it had been defrauded. As early as December, 1994, it notified defendant of its suspicions. Doc. 96, page 3.

The most novel legal question in this case concerns a curiosity in the application of the Missouri statute of limitations concerning fraud. Construed most favorably for plaintiff, and probably creating a claim that is not adequately asserted, it could possibly be inferred that plaintiff supposes that, at the time of contracting, defendant scheduled a 10% charge for collection efforts that it did not intend to perform. It may also be inferred that plaintiff had no adequate knowledge of defendant's actual collection efforts (or the cost of such efforts) for a considerable time, even though it was alerted to a remarkably high level of uncollected obligations. Plaintiff hazarded the theory that it had been defrauded in a letter as early as 1994. So the level of "actual discovery of fraud" may be debated. On the other hand, since plaintiff knew it had grounds for suing defendant

---

[12]Small also avers that inquiry was made to defendant regarding the chargebacks, but claims that plaintiff did not and could not learn about defendant's rationale for the chargebacks until 2005. (Small Affidavit: ¶ 26).

[13]The record suggests that suit was not deferred because of misconduct unknown in 1992 but discovered at some recent time before filing suit in 2003. Rather, plaintiff seems to have been unprepared financially to litigate against a major company, and was fearful of a claim by defendant, until concluding correctly that prosecution of such a claim was unlikely. Small affidavit ¶40. Whether defendant was engaged in unethical bluffing is not an issue for the court.

14

in 1992 or 1994 at the latest, one must conclude that "in the exercise of due diligence" the plaintiff "should have discovered the fraud" many years before the turn of the century.

Rademeyer v. Farris discusses the somewhat counter-intuitive Missouri rules barring claims for breach of fiduciary duty and fraud. Both fraud and fiduciary breach claims are generally subject to a due diligence test. However, fraud claims are treated with more generosity when a defendant is a fiduciary, but Judge Arnold wrote that "the fiduciary relationship need only have existed at the time of the alleged fraud." 284 F.3d at 837. Thus, if the contract between plaintiff and defendant was agreed upon before a fiduciary relationship existed, the normal requirement of due diligence is to be applied. I have little doubt that this was the relationship when the hypothetically fraudulent charge was written into the contract, and also that, given all the circumstances of record, plaintiff has failed to show due diligence.

Thus, plaintiff either discovered, or should have known of the allegedly fraudulent representation regarding collectibles in the spring of 1992, and filed its claim by the spring of 1997. Consequently, plaintiff's allegation of fraud is time barred, and its claim of fraudulent concealment fails to revive its claim through tolling.

In sum, based on the evidence presented, defendant has demonstrated that there are no genuine issues as to any material fact on any of the three claims, and is entitled to judgment as a matter of law.[14]

Accordingly, it is hereby

---

[14] Even if one might suppose the proof could establish that plaintiff was mistreated by defendant, I am satisfied that the Missouri courts would join me in classifying this case as "stale, stale, stale." In a diversity case it is my obligation to follow Missouri law.

15

ORDERED that defendant's motion for summary judgment (ECF doc. 81) is GRANTED. It is further

ORDERED that defendant's motion to strike plaintiff's expert (ECF doc. 106) is DENIED as moot. It is further

ORDERED that defendant's supplemental motion for summary judgment (ECF doc. 115) is GRANTED.  Judgment shall be entered in favor of defendant.


/s/ Howard F. Sachs
HOWARD F. SACHS
UNITED STATES DISTRICT JUDGE

September 15, 2005

Kansas City, Missouri